# Exhibit A

# KEYSTONE LAW

48 Chancery Lane  
London WC2A 1JF  
United Kingdom  

DX 193 Chancery Ln  
t +44 (0)20 3319 3700  
f +44 (0)845 458 9398  

@keystone_law  
enquiries@keystonelaw.co.uk  
www.keystonelaw.com  

Sony Music Entertainment Limited  
9 Derry Street  
London  
W8 5HY  

Lawrence.Abramson@keystonelaw.co.uk

FAO: Chief Executive Officer

**BY RECORDED DELIVERY**

**LETTER OF CLAIM**

8 December 2021

Dear Sirs,

**Re: Noel Redding Estate Limited ("NRE) and Mitch Mitchell Estate Limited ("MME")**

This letter is being sent to you in accordance with the Practice Direction on Pre-action Conduct and Protocols contained in the Civil Procedure Rules. We refer you to its terms and in particular to paragraphs 13 to 16 of the Pre-action PD concerning the court's powers to impose sanctions for failing to comply with its provisions. Ignoring this letter may lead our clients to commence proceedings against you and may increase your liability for costs.

**Introduction**

1. Our clients represent the families of respectively David Noel Redding ("Noel") and John Graham "Mitch" Mitchell **("Mitch")** who both died in relative poverty having never received their true entitlement from their works, performances and founding membership of the Jimi Hendrix Experience **("JHE")**.

2. By virtue of a Deed of Assignment dated 25 August 2021 Noel Redding's Experience LLC assigned all rights of copyright and all other rights of every kind then vested in it to the works, documents and materials described in schedule 2 of the said Assignment to our client (formerly known as Firefly Entertainment Limited), who now represents the interests of the deceased's estate[1]. A similar assignment was concluded on 26 August 2021 with

---

[1] Noel left his entire estate his will to his partner, Deborah McNaughton. When she died, her estate was left to her sisters, Nancy and Alexis McNaughton. By an agreement dated 14 July 2021, Nancy and Alexis McNaughton assigned all their rights to Noel Redding's Experience LLC.

Keystone Law is a trading name of Keystone Law Limited, a company authorised and regulated by the Solicitors Regulation Authority with its registered office at First Floor, 48 Chancery Lane, London WC2A 1JF, United Kingdom. Company number: 4650763. VAT number: GB 200 7302 72. SRA number: 409722. A list of the directors of Keystone Law is open to inspection at the registered office.

Aysha Mitchell, the sole beneficiary of Mitch's estate.  Copies of these assignments (with commercially sensitive information redacted) are at Annex 1 hereto.

3. Sony Music Entertainment Limited has profited from the unauthorised performance, publication, and/or distribution of recordings that infringe Noel and Mitch's copyrights and performer's rights in various sound recordings and performances and which also fail to compensate them under the terms of their partnership agreement set out on paragraph 7 below.

**Background**

4. In 1966, Noel founded JHE with Jimi Hendrix ("**Jimi**") and Mitch. Between 1966 and June 1969, they composed, recorded, performed, and toured as a trio.

5. JHE made many studio recordings and released four albums, entitled "*Are You Experienced*", "*Axis: Bold as Love*", "*Smash Hits*", and "*Electric Ladyland*" ("**the Recordings**"). Many other derivative works have been made of these performances and recordings by JHE in respect of which JHE (and therefore our clients) acquired further rights.

6. In 1966, having formed JHE, their unique style and sound soon attracted much attention from the music industry. This led to them signing a recording agreement with Michael Jeffery (**"MJ"**) and Brian 'Chas' Chandler (**"CC"**) on 11 October 1966 (**"the 66RA"**) (Annex 2). The 66RA was for an initial term of seven years with an option to extend for a further five years for an initial royalty payment of 2.5% rising to 5% after year two (clauses 1, 8 and 12). It does not appear that the option was ever exercised and so *ergo* the 66RA expired on 11 October 1973 (subject to the limited 'sell-off' right in clause 13(a)).

7. Clause 8 or the 66RA outlines various commissions to be paid to JHE "to be divided between them according to their own absolute discretion". As a result of that and increasing monies from touring and merchandising the band entered into a partnership agreement in or around May 1967 providing for a 50:25:25 split (with Jimi receiving 50%) of all revenues deriving from the JHE performances and recordings ("the Partnership Agreement"). Contemporaneous evidence of, amongst others, Michael Hecht (the band accountant) (Annex 3). confirms this position This was a tripartite partnership as confirmed also by Henry Steingarten in February 1971 in his final report as administrator of Jimi's estate of (Annex 4).

8. At the time of signing the 66RA, Noel and Mitch were both minors and had no guardianship nor had any legal representation or advice.  MJ and CC were also the managers of JHE and under fiduciary duties to advise them objectively.  The 66RA when considered as a whole was unduly onerous and in these circumstances leads to an obvious presumption of undue influence. It is our view that in these circumstances a court would have little difficulty in setting aside the 66RA.



9. Whilst the exploitation of the Recordings has generated vast amounts of money for you and the estate of Jimi and its successors, Noel and Mitch have not been compensated for their work and both died living in relative poverty. You and EHLL continue to make money from the Recordings whilst paying the families of Noel and Mitch nothing.

10. During November 2021, Jimi had nearly 8,000,000 monthly followers on Spotify alone and by way of example, "*All Along the Watchtower*" has had to date on the same platform nearly 500,000,000 streams.

**The Claim**

11. The Recordings were Qualifying Works pursuant to section 12 of the Copyright Act 1956, with remedies under Part III. This Act was subsequently reformulated and superseded by the Copyright, Designs and Patents Act 1988 (hereafter referred to as the CDPA 1988) wherein the Recordings are also qualifying works pursuant to section 1(1)(a) and (b) of that Act. Jimi, Noel and Mitch acquired originating first ownership of the copyrights in the Recordings made prior to the formation of the Partnership Agreement by, inter alia, performing, creating, arranging and collaborating in the Recordings, and importantly paying for the production of the Recordings as any expenditure by MJ and CC, if at all, was recouped under the terms of the 66RA from JHE's money. From May 1967 onwards, the Recordings were treated as partnership property as were all subsequent Recordings. There are no clauses in the 66RA granting any assignment of any rights for the life of the copyright. When read in its entire context, the 66RA was at best an assignment by the members of JHE (and/or in the case of some rights, a licence) of the Recordings and associated rights for a specific term.

12. Noel and Mitch by virtue of their various performances also acquired performers' rights pursuant to the Copyright and Related Rights Regulations 1996 SI 2967 (CRRR 1966) and CDPA 1988 as amended. Section 182 CDPA grants performing artists the right to authorise the making of a recording of their performance; that is, the right to consent to their work being recorded or not and to control the use of recordings, after authorisation, (see, sections 182A – the reproduction right; s182B - the distribution right; s182C - the rental and lending right; and s182CA - the making available right). These rights are property rights (s 191A CDPA 1988) and enable artists to seek royalties for the use of recordings of their performance, in the same way that authors can claim royalties for use of their work. With effect from 31 October 2001 the Copyright and Related Rights Regulations 2003 (SI 2003/2498) introduced new rights for authors and performers to control any "communication to the public" of their work and the "making available" of their work

13. It is our clients' position that the partnership was dissolved in June 1969 when Noel left JHE. At that point, all assets of the partnership including the copyrights in the Recordings reverted to Jimi. Noel and Mitch in their respective profit shares.



14. As stated above, by 11 October 1973 all rights that had been purportedly assigned or licensed under the 66RA reverted to Jimi. Noel and Mitch in their respective profit shares by operation of law. Accordingly, from that date, Jimi. Noel and Mitch in their respective profit shares became once again the exclusive owners, administrators, and competent licensors of the copyrights in the recordings, protected pursuant to Copyright Act 1956 above, and section 1(1) of the CDPA 1988.

15. According to the PPL database, Noel and Mitch and latterly their estates have been receiving equitable remuneration ("**ER**") from the agency since 1996. We have noted there were hundreds of re-registrations of the performances of JHE Recordings into the PPL database in 2009 by yourselves when you became the exclusive licensor. In virtually all cases both Noel and Mitch are correctly identified as 'contracted featured artist' and their estates continued to receive ER as derived from public performances. Whilst correctly recognising their performers' rights as regards public performance, you have neglected to obtain their consent for their exploitation by seeking a license for the exploitation of the Recordings in all other channels.

16. To the best of our knowledge and belief you have entered into various agreements[2] and carried out acts without the consent of our clients or the estates of Noel or Mitch in violation of their protected rights.

17. Simply put, it is our clients' position that from the expiration of the 66RA on 11 October 1973 up to the present day (if indeed this contract was enforceable given the circumstances within which it was enacted), our clients jointly with Jimi (and his successors in title) own all relevant rights in the Recordings. You have infringed their copyright and performers' rights by the release and usage of the JHE albums, CDs, DVD's, singles and electronic downloads and by exploiting and purporting to authorise the exploitation of the Recordings[3].

18. We have given consideration to the issue of delay in these claims being brought, and as to whether or not a fair trial is possible in these circumstances. We are of the view that, following the decision of the Hose of Lords in *Fisher v Brooker and Others* (HL 30 Jul 2009) this cannot assist you. Our clients, like Mr Fisher, are seeking declarations as to the existence of a long term property rights to which there is no statute of limitations and we are quite deliberately not seeking injunctive relief against you provided that our clients' rights to a suitable share of the income from the future exploitation of the Recordings is protected. Nor are there any issues with a fair trial when the claim rests so heavily on written evidence and well-documented facts.

---

[2] For example, on 19 July 2017 EHLL issued a press release announcing a renewal of an exclusive worldwide licensing agreement with you for Jimi Hendrix Music and Film Catalogue.

[3] With effect from 1 November 2013, the Copyright and Duration of Rights Regulations 2013 (SI 2013/1782) extended the term of copyright in, and performers' rights in, sound recordings from 50 to 70 years from the date of publication, playing in public or communication to the public of the sound recording

19. As a result of your aforesaid acts of infringement, our clients are entitled to:

    (1) damages for, inter alia, infringement of copyright and performers' rights;

    (2) proper accounting going forward and compensation for a fair share of the income received from your exploitation of those rights to our clients.

    (3) all other legal and equitable remedies available to our clients in respect of or arising from the matters summarised below.

**Releases**

20. In the interests of fairness and full disclosure, as well as saving time and cost, it is thought appropriate that we should send you, as part of our clients' initial disclosure, at Annex 5 documents that Noel and Mitch signed in 1973 and 1974 respectively that you may suggest operate as a bar to our clients' claims. We do not believe this to be the case for the following reasons:

    (1) Neither you nor our clients were parties to the release agreements, and you have paid no consideration, nor, as we understand the position, do your rights emanate from Jimi, his estate or Are You Experienced Ltd . The Noel release is very explicitly not expressed so as to extend to successors in interest. We accept that the Mitch release does purport to extend to the successors and assigns of Jimi's estate, but is subject to certain reservations set out in clause 6 that we deal with in sub-paragraph 5 below.

    (2) The claims that Noel and Mitch brought in the USA in the early 1970's were for compensation for not having received their share of income deriving from the Recordings. There was no claim made in any of the proceedings for their copyright interests. It does not appear that Noel or Mitch or their lawyers at the time even had a copy of the 66RA. The parties could therefore not have contemplated that the documents would operate so as to preclude such claims. See in this regard the decision of the House of Lords in *BCCI v Ali* ([2001] UKHL 8, [2002] 1 AC 251).

    (3) At the time that the documents were created, none of the parties would have been able to foresee or contemplate the advent of digital media and streaming revenues and their profound materiality nor the introduction of performer's rights which cannot therefore have been waived before they arose. See again *BCCI v Ali*.

    (4) Even if they were enforceable, the purported releases only extended to claims for royalties or other compensation that the estate of Jimi Hendrix (and the company it controlled "Are You Experienced Ltd) had and were receiving at that time and cannot on any view operate as any assignment of rights, still less rights that neither Noel nor Mitch thought that they had or had not yet been created.

5



(5) In both documents Noel and Mitch specifically reserved their rights to bring proceedings against various other parties for 'whatever claims and rights he may have' (Mitch) or to be regarded as 'a waiver or prejudice to my claim or claims' (Noel) and so the releases cannot be construed as a wholesale waiver of all such rights in favour of anyone dealing with the released parties. Indeed, Noel's reserved his rights as regards claims against Yameta and its officers and directors i.e. MJ and CC. Mitch reserved his rights to bring proceedings against Barclay Records, Track Records, Ember Records, the estate of MJ and CC. Barclay, Track and Ember essentially collected royalties from masters generated throughout the rest of the world excluding North America. Warners also only had North American rights. It therefore seems clear that the releases were only intended at best to apply in respect of the North American exploitation of the Recordings.

**Quantum and summary of loss**

21. Based upon publicly available information, we estimate that there have been at least 3,000,000,000 streaming plays of the Recordings across various streaming services in recent years. This does not include physical or digital sales of the Recordings.

22. Whilst a true accounting of the value derived from the accumulated number of streaming plays, record sales, digital sales, and other categories of damages has yet to be tabulated the total value per annum of such streaming figures and sales is estimated to be in the millions of pounds.

23. Our clients reserve the right to elect for either an account of profits or an inquiry into damages, pending disclosure of certain information from you (see below).

**Disclosure required**

24. Please provide to us within 28 days copies of the following documents which we believe are relevant to this matter and are likely to be in your control:

    (1) A full account of all income received from the exploitation of the JHE's intellectual property rights including:

    (2) A schedule of royalties from all sources received for the period from December 2015 to date;

    (3) A schedule of net receipts for sale of physical music product such as vinyl albums and compact discs

    (4) A schedule of income received from the EH owned website www.daggerrecords.com

    (5) A schedule of synchronisation income received for the period 2014 to date;



(6) A schedule of licensing income received for the period 2015 to date;

(7) A schedule of any share of income received as label allocation by PPL;

(8) Copies of all contracts which purportedly authorise the licensing, distribution and merchandising of our client's intellectual property rights, together with a schedule of the income received from those contracts.

Please note that this is not an exhaustive list of the relevant documents of which disclosure will be required from you in due course.

**Preservation of documents**

25. Given that litigation is now intimated, you must take proper and appropriate steps to ensure that no relevant documents, including electronic documents, that are in your control, are altered, lost, destroyed or disposed of pursuant to paragraph 7 of CPR Practice Direction 31B.

**Alternative dispute resolution**

26. Our clients are minded of their obligations to consider ADR, and are prepared to consider this once all the disclosure sought has been provided.

**Action required**

27. You should provide an acknowledgment to this letter within 14 days of receipt with a full response to this letter by no later than 28 days after the date of this letter. Please note that in the absence of a full response by that date, we are instructed to issue and serve proceedings against you without further notice and to seek relief by way of an account of profits and/or damages, interest and costs.

Yours faithfully,

**Lawrence Abramson**
**Partner**
**Keystone Law**

